1 | CALL & JENSEN
A Professional Corporation
2 | John T. Egley, Bar No. 232545
Chris C. Scheithauer, Bar No. 184798
3 | Alexander M. Harrison, Bar No. 285537
610 Newport Center Drive, Suite 700
4 | Newport Beach, CA 92660
Tel:    (949) 717-3000
5 | jegley@calljensen.com
cscheithauer@calljensen.com
6 | aharrison@calljensen.com

7 | Attorneys for Defendant USA DEBUSK LLC

8

9 | **UNITED STATES DISTRICT COURT**

10 | **NORTHERN DISTRICT OF CALIFORNIA**

11

12 | GARY ALAN KITTRELL, on behalf of himself
and others similarly situated,

Case No.    3:25-cv-2432

13 | Plaintiff,

**DEFENDANT USA DEBUSK LLC'S
NOTICE OF REMOVAL**

14 | vs.

15 | USA DEBUSK LLC; and DOES 1 to 100,

Contra Costa Superior Court
Case No. C25-00412
16 | Defendant.

(*Originally filed in County of Contra Costa on
February 11, 2025* )

17

18

19

20

21

22

23

24

25

26

27

28

1    TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

2    DISTRICT OF CALIFORNIA AND TO PLAINTIFF AND PLAINTIFF'S ATTORNEYS

3    OF RECORD:

4        PLEASE TAKE NOTICE that Defendant USA Debusk LLC ("USA Debusk" or

5    "Defendant"), without waiver or limitation of its right to compel arbitration, hereby removes the

6    above-captioned action from the Superior Court of the State of California for the County of Contra

7    Costa, in which the action is currently pending, Case No. C25-00412, to the United States District

8    Court for the Northern District of California on the grounds that this Court has jurisdiction over

9    this action pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and 1453 and all other applicable bases for

10   removal.

11   **I.    STATEMENT OF JURISDICTION**

12       1.    This Court has original jurisdiction over this action pursuant to the Class Action

13   Fairness Act of 2005 ("CAFA"), which vests the United States district courts with original

14   jurisdiction of any civil action: (a) that is a class action with a putative class of more than a

15   hundred members; (b) in which any member of a class of plaintiffs is a citizen of a State different

16   from any defendant; and (c) in which the matter in controversy exceeds the sum or value of

17   $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. §1332(d). CAFA authorizes removal of

18   such actions in accordance with United States Code, title 28, section 1446. As set forth below, this

19   case meets all of CAFA's requirements for removal and is timely and properly removed by the

20   filing of this Notice.

21       2.    By filing this Notice, Defendant does not intend to waive, and hereby reserves, any

22   objection as to venue, the legal sufficiency of the claims alleged in the Action and all other

23   defenses. Defendant reserves the right to supplement and amend this Notice.

24   **II.   BACKGROUND OF PLEADING AND PROCESS**

25       3.    On February 11, 2025, Plaintiff Gary Kittrell ("Plaintiff") filed a Class Action

26   Complaint ("Complaint") against USA Debusk in the Superior Court of the State of California for

27   the County of Contra Costa, entitled *Gary Alan Kittrell, on behalf of himself and others similarly*

28   *situated, Plaintiffs, vs. USA Debusk LLC; and DOES 1 through 100; inclusive, Defendants*, Case

CALL&
JENSEN

No. C25-00412  (the "State Court Action").

4.     On February 24, 2025, USA Debusk was served through its registered agent with a copy of the Summons and Complaint, which are attached as **Exhibits A** and **B**, respectively, to the Declaration of Chris C. Scheithauer ("Scheithauer Decl."), ¶ 2; see also Declaration of Brian Black ("Black Decl."), ¶ 4 (USA Debusk served on February 24, 2025).

5.     In addition to the Summons and Complaint, also attached to the Scheithauer Declaration are copies of the Civil Case Cover Sheet, Notice of Case Assignment, and Proof of Service of Summons, all filed in the State Court Action. *See* Scheithauer Decl., **Exhibit C** (collectively attached).

6.     On March 7, 2025, USA Debusk filed and served its Answer to the Complaint in the State Court Action. A copy of the Answer is attached to the Scheithauer Decl. as **Exhibit D**.

7.     **Exhibits A through D** to the Scheithauer Decl. constitute all pleadings, process, and orders filed and served in this action in state court through the date of removal. *See* Scheithauer Decl., ¶¶ 2-6.

8.     The Complaint purports to allege seven causes of action for: (1) Failure to Pay Wages for All Hours Worked at Minimum Wage In Violation of Labor Code Sections 1194 and 1197; (2) Failure to Pay Overtime Wages for Daily Overtime Worked and/or Failure to Pay Overtime Wages at the Proper Rate of Pay in Violation of Labor Code Sections 510 and 1194; (3) Failure to Authorize or Permit Meal Periods in Violation of Labor Code Sections 512 and 226.7; (4) Failure to Authorize or Permit Rest Periods in Violation of Labor Code Section 226.7; (5) Failure to Pay Wages for Accrued Paid Sick Days at the Regular Rate of Pay in Violation of Labor Code Section 246; (6) Failure to Provide Complete and Accurate Wages Statements in Violation of Labor Code Section 226; and (7) Unfair Business Practices, in Violation of Business and Professions Code Sections 17200, et seq.

9.     Plaintiff seeks to maintain the action as a class action on behalf of the following classes and subclasses:

> Plaintiff brings this action on behalf of himself on behalf of others similarly situated, and on behalf of the general public, and as members of a Class defined as follows:

A. **Minimum Wage Class:** All current and former hourly non-exempt employees employed by Defendants as direct employees as well as temporary employees employed through temp agencies in California at any time from four (4) years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who were not paid at least minimum wage for all time they were subject to Defendants' control.

B. **Overtime Class:** All current and former hourly truck drivers (limited to shifts where they did not operate semi-trucks and/or did not primarily operate semi-trucks) and all other hourly non-exempt employees employed by Defendants as direct employees as well as temporary employees employed through temp agencies in California at any time from four (4) years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who worked more than eight (8) hours in a workday, forty (40) hours in a workweek, and/or seven (7) days in a workweek, to whom Defendants did not pay overtime wages.

C. **Regular Rate Class:** All current and former hourly truck drivers (limited to shifts where they did not operate semi-trucks and/or did not primarily operate semi-trucks) and all other hourly non-exempt employees employed by Defendants as direct employees as well as temporary employees employed through temp agencies in California at any time from four (4) years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who worked more than eight (8) hours in a workday, more than forty (40) hours in a workweek, and/or seven (7) days in a workweek, who received additional remuneration during pay periods in which they were paid overtime wages, and whose compensation did not include such additional remuneration when Defendants calculated those employees' overtimes wages.

D. **Meal Period Class: All current and former hourly truck drivers** (limited to shifts where they did not operate semi-trucks and/or did not primarily operate semi-trucks) and all other hourly non-exempt employees employed by Defendants as direct employees as well as temporary employees employed through temp agencies in California at any time from four (4) years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who worked shifts more than five (5) hours yet Defendants failed to authorize or permit all required duty-free meal periods of not less than thirty (30) minutes.

E. **Meal Period Premium Wages Class:** All current and former hourly truck drivers (limited to shifts where they did not operate semi-trucks and/or did not primarily operate semi-trucks) and all other hourly non-exempt employees employed by Defendants as direct employees as well as temporary employees employed through temp agencies in California at any time from four (4) years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who received additional remuneration during pay periods in which they were paid meal period premium wages and whose regular rate of pay did not include such additional remuneration when Defendants calculated those employees' meal period premium wages.

F. **Rest Period Class:** All current and former hourly truck drivers (limited to shifts where they did not operate semi-trucks and/or did not primarily operate semi-trucks) and all other hourly non-exempt employees employed by Defendants as direct employees as well as temporary employees employed through temp agencies in California at any time from four (4) years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who worked shifts of at least three-and-a-half (3.5) hours who did not receive all required duty-free rest periods of a net ten (10) minutes for every four (4) hours worked or major fraction thereof.

G. **Rest Period Premium Wages Class:** All current and former hourly truck drivers (limited to shifts where they did not operate semi-trucks and/or did not primarily operate semi-trucks) and all other hourly non-exempt employees employed by



Defendants as direct employees as well as temporary employees employed through temp agencies in California at any time from four (4) years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who received additional remuneration during pay periods in which they were paid rest period premium wages and whose regular rate of pay did not include such additional remuneration when Defendants calculated those employees' rest period premium wages.

H. **Sick Time Pay Class:** All current and former hourly truck drivers' (limited to shifts where they did not operate semi-trucks and/or did not primarily operate semi-trucks) and all other hourly non-exempt employees employed by Defendants in California at any time from four (4) years prior to the filing of the initial Complaint in this action through the date notice is mailed to a certified class who were employed by Defendants for 30 days or more, but who failed to accrue paid sick day days at the rate of no-less-than one (1) hour per every thirty (30) hours worked, beginning at the commencement of employments.

I. **Wage Statement Class:** All current and former hourly truck drivers' (limited to shifts where they did not operate semi-trucks and/or did not primarily operate semi- trucks) and all other hourly non-exempt employees employed by Defendants as direct employees as well as temporary employees employed through temp agencies in California at any time from one (1) year prior to the filing of the initial Complaint in this action through the date notice is mailed to a certified class who received inaccurate or incomplete wage and hour statements.

J. **California Class:** All aforementioned classes are herein collectively referred to as the "California Class."

*See* Scheithauer Decl., Exh. B, Complaint, ¶ 46.

10.     Defendant USA Debusk denies Plaintiff or the proposed classes are entitled to any relief by the Complaint or that the action may be maintained as a class action, but treats Plaintiff's allegations as true for purposes of this Notice of Removal.

**III.    TIMELINESS OF REMOVAL**

11.     This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b), which provides that such Notices "shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim upon which such action or proceeding is based."

12.     Defendant USA Debusk has filed this Notice within 30 days of February 24, 2025, the date on which Plaintiff served USA Debusk's agent for service of process with the Complaint. *See* Black Decl., ¶ 4.

13.     Thus, this action is being removed within 30 days of the first date upon which USA Debusk received, through service or otherwise, with a paper giving it knowledge that the action was removable. *See* 28 U.S.C. § 1446(b); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999); *Hamilton San Diego Apartments v. RBC Capital Markets Corp.*, 2012

WL 12863116, at *1 (S.D. Cal. Dec. 4, 2012) ("A defendant corporation is considered to have received a copy of the initial pleading when its authorized agent accepts service of process."). This action has not previously been removed to federal court.

## IV.    CLASS ACTION FAIRNESS ACT ("CAFA") REMOVAL

14.    The Class Action Fairness Act of 2005 ("CAFA") creates federal jurisdiction over lawsuits in which "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant," and involves a putative class that consists of more than 100 members. 28 U.S.C. §§ 1332(d)(2)(A) and (d)(5). Each of these three requirements is met.

15.    This Court has original subject matter jurisdiction over this action under CAFA because the proposed class is at least 100 members, at least one plaintiff or class member and USA Debusk are citizens of different states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d). There is no presumption against removal under CAFA. *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S.Ct. 547, 550, 554 (2014) ("no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilities adjudication of certain class actions in federal court.").

### A.    Plaintiff Alleges A Class Action Of At Least 100 Persons

16.    CAFA defines a "class action" to include civil actions filed under state statutes or rules of procedure similar to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") that authorize an action to be brought by one or more representative persons as a class action. *See* 28 U.S.C. § 1332(d)(1)(B).

17.    Plaintiff brings this action for himself and various putative classes which put in controversy "[a]ll current and former hourly non-exempt employees employed by Defendants as direct employees as well as temporary employees employed through temp agencies in California at any time from four (4) years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class…" *See* Scheithauer Decl., Exh. B, ¶ 46(A). This action is therefore a "class action" under CAFA, and the relevant putative class period is February 11, 2021 to the present (4 years prior to when the Complaint was originally filed).

18.    USA Debusk employed approximately 494 nonexempt employees during the putative class period – four years preceding the filing of the Complaint to the present. *See* Black Decl., ¶ 8. Accordingly, the number of putative class members that Plaintiff puts at issue in this lawsuit easily exceeds 100 persons, as required by 28 U.S.C. § 1332(d)(5)(B).

**B.    Diversity of Citizenship Is Satisfied Because Plaintiff And Defendant USA Debusk Are Citizens Of Different States**

19.    CAFA's minimal diversity requirement is satisfied, *inter alia*, when "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. §§ 1332(d)(2)(A); 1453(b). Minimal diversity of citizenship exists here because Plaintiff and defendant USA Debusk are citizens of different states.

20.    **Plaintiff's Citizenship**. Plaintiff's Complaint does not identify where Plaintiff lives or is otherwise domiciled, but does state that he was "employed" by USA Debusk in Contra Costa County, California. *See* Scheithauer Decl., Ex. B., Complaint, ¶ 6.

21.    USA Debusk's records show that Plaintiff is an active employee with USA Debusk and he reported to USA Debusk that his home residence is in San Joaquin County, California.[1] *See* Black Decl., ¶ 16.

22.    Similarly, USA Debusk's records show that most of the members of the putative classes in this case have notified USA Debusk that they reside in California. *See* Black Decl., ¶ 17.

23.    To establish citizenship for diversity purposes, a person is a citizen of the state in which he or she is domiciled. *Ehrman v. Cox Commc'ns, Inc.*, 932 F.3d 1223, 1228 (9th Cir. 2019). Residence is *prima facie* evidence of domicile. *State Farm Mut. Auto Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994) ("[T]he place of residence is *prima facie* the domicile."); *Saldana v. Home Depot USA, Inc.*, 2016 WL 3391808, at *2 (E.D. Cal. June 20, 2016) (same); *Mondragon v. Capital One Auto Finance*, 776 F.3d 880, 885-86 (9th Cir. 2013) (holding that, in connection with removal to federal court, a person's continuing domicile in a state establishes citizenship "unless rebutted with sufficient evidence of change.").

---

[1] USA Debusk is not stating here Plaintiff's full California address (other than county) in order to protect Plaintiff's privacy rights.

24.    **USA DEBUSK'S Citizenship**. Conversely, defendant USA Debusk is <u>not</u> a citizen of California. USA Debusk is, and at all times relevant to this action (including at the time this action commenced), a limited liability company formed under the laws of Texas and maintains its corporate headquarters and principal place of business in Texas at 1005 West 8th Street, Deer Park, Texas, 77536. *See* Black Decl., ¶ 5. USA Debusk's sole member is Debusk Holdings LLC, whose headquarters and principal place of business is also in Texas at 1005 West 8th Street, Deer Park, Texas, 77536. *Id.* No owner of USA Debusk (*i.e.* the LLC "members") resides in California. *Id.*

25.    USA Debusk has operations in various states around the country, although its activities and the majority of its administrative functions are performed from its corporate headquarters in Texas where its officers direct, control and coordinate the company's activities. *See* Black Decl., ¶ 6.

26.    Limited liability companies are generally like partnerships and unincorporated associations for diversity purposes under 28 U.S.C. § 1332. *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). Under CAFA, "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10).

27.    Thus, to determine jurisdiction under CAFA, limited liability companies such as USA Debusk, are expressly treated the same as corporations in determining their principal place of business (*i.e.*, where its "nerve center" is located). *See*, *e.g.*, *Abrego v. Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006) (CAFA "departs from the rule that … a limited partnership's or unincorporated association's citizenship can be determined only by reference to all of the entity's members"); *Rubalcaba v. R&L Carriers Shared Services, LLC*, 2024 WL 1772863, *2-3 (N.D. Cal. April 23, 2024) ("this Court has held that for purposes of CAFA jurisdiction, the citizenship of an LLC is determined by where its principal place of business, or 'nerve center' is located" not where the LLC's members are located); *Jack v. Ring LLC*, 553 F.Supp.3d 711, 715 (N.D. Cal. Aug. 21, 2021) (holding that under 28 U.S.C. § 1332(d)(1), (CAFA deems an LLC a citizen of the state where it has its principal place of business, not where its members are located).

1       28.    To determine its principal place of business for diversity purposes, the appropriate

2   test is the "nerve center" test. *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010). Under the "nerve

3   center" test, the principal place of business is the state where the "corporation's officers direct,

4   control, and coordinate the corporation's activities" and where its headquarters are located. *Id.*

5       29.    While USA Debusk has offices in states around the country, including California,

6   USA Debusk's principal place of business is Texas and it has been so at all times relevant this

7   action (at least 4 years prior to when the Complaint was filed). *See* Black Decl., ¶¶ 5-6.

8       30.    Similarly, at all times relevant this action (at least 4 years prior to when the

9   Complaint was filed): (a) Texas is where USA Debusk's headquarters have been located and from

10  where its officers direct, control, and coordinate the corporation's activities; (b) USA Debusk's

11  officers in Texas have coordinated company activities and provide final decision-making and

12  oversight of key administrative and executive functions, such as legal, accounting, finance, tax,

13  business development, environmental, health and safety, and technology from Texas; and USA

14  Debusk's officers have exercised final control and oversight over the company's business planning

15  and strategies from its Texas headquarters. *See* Black Decl., ¶ 6.

16      31.    Therefore, USA Debusk is, and was at the time this action was commenced, a

17  citizen of Texas.

18      32.    No other party has been named or served in this case as of the date of this removal.

19  Pursuant to 28 U.S.C. § 1441(b)(1), the residence of fictitious and unknown defendants is

20  disregarded for purposes of establishing removal jurisdiction under 18 U.S.C. § 1332. *See Soliman*

21  *v. Philip Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002); *Fristoe v. Reynolds Metals Co.*, 615 F.2d

22  1209, 1213 (9th Cir. 1980). Thus, the existence of Doe defendants 1 through 50, inclusive, does

23  not deprive this Court of jurisdiction.

24      33.    Accordingly, CAFA diversity is satisfied because the named Plaintiff is diverse

25  from defendant USA Debusk. 28 U.S.C. § 1332(d)(2).

26  **C.**    **The Amount in Controversy Exceeds $5,000,000**

27      34.    While USA Debusk denies any and all liability as to Plaintiff's claims, the amount

28  in controversy as alleged in the Complaint exceeds $5,000,000, exclusive of interest and costs. All

calculations supporting the amount in controversy herein are estimates based on the Complaint's allegations, assuming, without any admission, the truth of the allegations, and assuming liability (which USA Debusk disputes) is established. *See., e.g., Lewis v. Verizon Commc'ns, Inc*., 627 F.3d 395, 400 (9ᵗʰ Cir. 2010) ("The amount is controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability.").[2]

35.    Likewise, these calculations are based on the putative class alleged in the Complaint, and in no way indicate that class treatment is appropriate in this case, that Plaintiff has standing to represent such an alleged class, or that the proposed class would meet the requirements of Rule 23 of the Federal Rules of Civil Procedure.

36.    Consistent with Fed. R. Civ. P. 8(a), a removing defendant's notice of removal need only contain plausible allegations to demonstrate the amount in controversy. Evidentiary submissions are not required unless the removing defendant's allegations are contested by the plaintiff or questioned by the Court:

> In sum, as specified in 1446(a), a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. Evidence establishing the amount is required by 1446(c)(2)(B) only when the plaintiff contests or the court questions, the defendant's allegation.

*Dart Cherokee*, 135 S.Ct. at 554.

37.    Plaintiff's complaint is the "first source of reference in determining the amount in controversy." *LaCrosse*, 775 F.3d at 1202 (citing *St. Paul Mercury Indem. Co. v. Red Cab Co*., 303 U.S. 283, 289 (1938). As such, the inquiry is what amount is put "in controversy" by Plaintiff's Complaint. However, as set forth in detail below, the Supreme Court has noted that a court should reject a named Plaintiff's attempt to disclaim that the amount in controversy exceeds CAFA's threshold where the allegations otherwise support jurisdiction.

38.    To determine whether the amount in controversy exceeds $5,000,000, the claims of the individual class members are aggregated. 28 U.S.C. § 1332(d)(6). The amount in controversy requirement is met "if the value of the matter in litigation exceeds $5,000,000, either from the

---

[2] *See LaCrosse v. Knight Truck and Trailer Sales, LLC*, 775 F.3d 1200, 1203 (9th Cir. 2015) ("Even when defendants have persuaded a court upon a CAFA removal that the amount in controversy exceeds $5 million, they are still free to challenge the actual amount of damages in subsequent proceedings and trial.") (internal citations omitted).

viewpoint of the plaintiff or the viewpoint of the defendant and regardless of the type of relief sought (*e.g.*, damages, injunctive relief, or declaratory relief)." Senate Judiciary Committee Report, S. REP. 109-14, at 49 (2005), reprinted in 2005 U.S.C.C.N. 3, 11. Moreover, the Senate Judiciary Committee Report on the final version of CAFA makes clear that any doubts regarding the maintenance of class actions should be resolved in favor of federal jurisdiction: "[I]f a federal court is uncertain about whether 'all matters in controversy' in a purported class action 'do not in the aggregate exceed the sum or value of $5,000,000,' the court should err in favor of exercising jurisdiction over the case.… Overall, new section 1332(d) is intended to expand substantially federal jurisdiction over class actions. Its provisions should be read broadly, with a strong preference that interstate class action should be heard in federal court if properly removed by any defendant." *Id.*

39.     "[I]n assessing the amount in controversy, a removing defendant is permitted to rely on a chain of reasoning that includes assumptions." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 925 (9th Cir. 2019). Such assumptions need only be "plausible" and "reasonable in light of the allegations in the complaint." *Id.* at 927. "The amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability." *Id.* (quoting *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010)). It thus "reflects the *maximum* recovery the plaintiff could reasonably recover." *Id.* (emphasis in original). "An assertion that the amount in controversy exceeds the jurisdictional threshold is not defeated merely because it is equally possible that damages might be 'less than the requisite … amount[.]'" *Id.* A removing defendant need only "show[] potential recovery *could* exceed" the jurisdictional amount to satisfy its burden for removal. *Id.* (emphasis in original; internal quotations omitted). The "strength of any defenses" "is irrelevant to determining the amount that is at stake in the litigation." *Id.* at 928. Defenses a defendant may have do not affect the amount in controversy for purposes of removal jurisdiction. *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 295-296 (1938); *Riggins v. Riggins*, 415 F.2d 1259, 1261-1262 (9th Cir. 1969).

40.     A Plaintiff may not avoid CAFA removal simply by disclaiming the amount at issue exceeds $5 million. *See, e.g.*, *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592-93

(2013) (named plaintiff in putative class action cannot avoid CAFA removal by claiming to seek less than the jurisdictional amount under CAFA because the named plaintiff cannot bind the absent class members); *Simring v. GreenSky, LLC*, 2022 WL 894206, at *3 (11th Cir. Mar. 28 2023).

41.    "The amount in controversy may include 'damages (compensatory, punitive, or otherwise) and the cost of complying with an injunction, as well as attorneys' fees awarded under fee shifting statutes.'" *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 416 (9th Cir. 2018). Penalties also are properly included in the amount in controversy. *See Adkins v. J.B. Hunt Transport, Inc.*, 293 F. Supp. 3d 1140, 1146 (E.D. Cal. Mar. 2018) (including waiting time and wage statement penalties under California Labor Code §§ 203 and 226(e) in amount in controversy).

42.    Notwithstanding the various alleged in the Complaint, there is not a material difference for purpose of the calculations of the number of employees put in controversy for most of the claims. Only the Wage Statement Class seeks to define a group of employees from only one year prior to when the Complaint was filed – the remainder of the classes are for four years and would potentially put in controversy the same employees for that period.

43.    During the approximate <u>four-year time period</u> of February 11, 2021 to February 28, 2025 ("Four-Year Period"), USA Debusk employed approximately **494** non-exempt employees in the state of California. All of them were full-time employees. Of those **494** total non-exempt employees, **196** are still current employees and **297** are former employees (having terminated employment for various reasons). Those approximately **494** total non-exempt employees worked approximately **27,509** workweeks during that period (that is also the same number of pay periods because USA Debusk pays wages to non-exempt employees each week). The average hourly wage during that time period for non-exempt employees was approximately **$28.81** per hour. During this period, USA Debusk paid its non-exempt employees in California approximately **343,190** hours of overtime pay and approximately **15,715** hours of sick pay to its California non-exempt employees. *See* Black Decl., ¶ 8.

44.    During the approximate <u>one-year time period</u> of February 11, 2024 to February 28, 2025 ("One-Year Period"), USA Debusk employed approximately **277** non-exempt employees in the state of California. All of them were full-time employees. Of those **277** total non-exempt employees, **192** are still current employees and **85** are former employees (having terminated employment for various reasons). Those approximately **277** total non-exempt employees worked approximately **8,144** workweeks during that period. The average standard hourly wage during that time period for non-exempt employees was approximately **$30.29** per hour. *See* Black Decl., ¶ 9.

45.    Based on the foregoing, the below analysis shows the amount in controversy in this action easily exceeds $5,000,000 in the aggregate based on the claims as pleaded by Plaintiff.

**1.    Plaintiff's Claim for Recovery of Unpaid Wages**

46.    Plaintiff's claim for unpaid wages alleges that USA Debusk failed to pay Plaintiff and the Class for all hours worked. Plaintiff alleges this was because of such things as, *inter alia*:

- Having "policies, practices and procedures" "**Rounding down**" or "shaving down" employees' time for all clock-ins and clock-outs (including meal breaks) "to the nearest **quarter of an hour**, to the benefit of Defendants." *See* Scheithauer Decl., Exh. B, Complaint, ¶20 and ¶ 52 (emphasis added).

47.    Plaintiff does not specify how often the aforementioned "policies, practices and procedures" caused the Class to be underpaid for all their time. However, California federal courts have held that for purposes of estimating the amount in controversy, a party removing pursuant to CAFA may reasonably assume a 20-60% violation rate where the Complaint does not specify the frequency of alleged violations. *See*, *e.g.*, *Rubalcaba v. R&L Carriers Shared Services, LLC*, 2024 WL 1772863, *2-3 (N.D. Cal. April 23, 2024) (noting courts in the Ninth Circuit approve estimating violation rate of up to 60% where complaint alleges a "pattern and practice" without further limitations); *Bryant v. NCR Corp.*, 284 F. Supp. 3d 1147, 1151 (S.D. Cal. 2018) (finding defendant's estimate of a 60% violation rate "reasonable" and "conservative[]"); *Feao v. UFP Riverside, LLC*, 2017 WL 2836207, at *4 (C.D. Cal. June 29, 2017) (same); *Alvarez v. Office Depot, Inc.*, 2017 WL 5952181, at *3 (C.D. Cal. Nov. 30, 2017) (same); *Stanley v. distribution Alternatives, Inc.*, 2017 WL 6209822, at *2 (C.D. Cal. Dec. 7, 2017) (same).

CALL&
JENSEN

48.    As noted above, Plaintiff alleges an illegal policy of "rounding" down employee time to the nearest quarter hour for all clock-ins and clock-outs.  Complaint, ¶20 and ¶ 52. Since all of these employees were full-time employees who normally worked at least an 8-hour day, that would mean that there are clock-ins/clock-outs at least **4 times per day** (clock-in for day, clock-out for meal period, clock-in for meal period, and clock-out for day). *See* Black Decl., ¶ 10-11. There would be days when employees may be entitled to a second meal period for working longer than 10-hour shifts [*Id*. ¶ 11], but USA Debusk will be conservative and not include those extra clock-ins/outs here. If Plaintiff's allegations are true, then considering the normal 4 clock-in/outs that employees would have most days, it is reasonable to assume an average of 15 minutes of unpaid time each day per employee (about average of 3.75 minutes shaved per punch).

49.    Taking a conservative approach assuming that this only occurred 60% of the time for the Four Year Period (notwithstanding that Plaintiff alleges a regular "policy and practice"). Taking that 15-minutes (.25 hour) per day multiplied by the average hourly rate of $28.81, multiplied by the 27,509 workweeks of the Class multiplied by the standard 5 days work per week multiplied by a 60% violation rate [.25 hours * $28.81 hourly rate * 27,509 workweeks * 5 days * .60 violation rate] yields an estimated amount in controversy of **$594,400.71** in unpaid wages. *See* Black Decl., ¶ 8.

### 2.    Plaintiff's Claim for Liquidated Damages for Unpaid Wages

50.    In addition to seeking the actual allegedly unpaid wages for time worked off the clock, Plaintiff (on behalf of him and the Class) seeks further *liquidated damages* under Labor Code § 1194.2 for failure to pay wages on that off-the-clock work. *See* Scheithauer Decl., Exh. B., Complaint, ¶ 55 ("Pursuant to Labor Code sections 1194 and 1194.2, Plaintiff and the [Class] are entitled to recover … liquidated damages in the amount of their unpaid wage ….").

51.    Labor Code section 1194.2 provides that employees who demonstrate that they were not paid minimum wages for all time (i.e., were not paid for off-the-clock work) are also "entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon." *See, e.g*., Labor Code §§1194 and 1194.2.



52. Because Plaintiff is also seeking liquidated damages under Labor Code 1194.2 for him and the Class in addition to just the alleged unpaid wages owed for working off the clock, the amount in liquidated damages is statutorily double the unpaid wages – thus another **$594,400.71** in liquidated damages.

### 3. Plaintiff's Claim for Overtime Pay

53. Plaintiff's unpaid overtime claim is somewhat duplicative of his unpaid wage claim. *See* Scheithauer Decl., Exh. B., Complaint, ¶¶ 20, 62 (the "rounding down" policy led to unpaid overtime). But it involves separate two components – the first of which is tied to the rounding policy and a second tied to allegedly paying overtime at lower than the correct rate. Complaint, ¶¶ 62-66.

54. Under California law, the standard overtime rate is 1.5 times the regular rate for time in excess of 8 hours in a day or 40 in a workweek. *See* Complaint, ¶ 64.[3]

55. As to the first component of unpaid overtime (overtime worked off the clock and thus unpaid), the alleged "off-the-clock" work that constitutes overtime would add an additional 0.5 the hourly rate of overtime owed (since the 1.0 off-the-clock work was already calculated into the unpaid wage claim above and only the 0.5 would still be owed for the 1.5 overtime rate). At USA Debusk, employees regularly worked at least 8-hours in a day and at least 40-hour week plus some overtime. *See* Black Decl., ¶¶ 10-15. It was standard for these employees to work overtime each workweek. Thus, most, if not all, of the off-the-clock work could constitute overtime, thus triggering the additional 0.5 rate of pay owed that was not already factored into the unpaid wage claim above. *Id.*

56. For example, Plaintiff's weekly paystub for the period of October 17, 2022 through October 23, 2022 shows that Plaintiff worked 40 hours of straight time and 22.50 hours of overtime, for total hours worked and paid of 66.50 hours for the workweek. Other non-exempt employees regularly worked similar overtime. *See* Black Decl., ¶ 14. Thus, much of the off-the-

---

[3] For purposes of removal, USA Debusk is being conservative and not factoring in times when Plaintiff's allegations may trigger double time overtime rate.

1    clock work alleged in this case could be overtime because it would all be in addition to the normal

2    40+ hour work week already recorded.

3        57.    Just like with regard to the unpaid wage claim, Plaintiff does not specify how often

4    the aforementioned "policies, practices and procedures" caused the Class to be underpaid for all

5    their overtime. However, California federal courts have held that for purposes of estimating the

6    amount in controversy, a party removing pursuant to CAFA may reasonably assume a 20-60%

7    violation rate where the Complaint does not specify the frequency of alleged violations.  *See*, *e.g.*,

8    *Rubalcaba v. R&L Carriers Shared Services, LLC*, 2024 WL 1772863, *2-3 (N.D. Cal. April 23,

9    2024) (noting courts in the Ninth Circuit approve estimating violation rate of up to 60% where

10   complaint alleges a "pattern and practice" without further limitations); *Bryant v. NCR Corp.*, 284

11   F. Supp. 3d 1147, 1151 (S.D. Cal. 2018) (finding defendant's estimate of a 60% violation rate

12   "reasonable" and "conservative[]"); *Feao v. UFP Riverside, LLC*, 2017 WL 2836207, at *4 (C.D.

13   Cal. June 29, 2017) (same); *Alvarez v. Office Depot, Inc.*, 2017 WL 5952181, at *3 (C.D. Cal.

14   Nov. 30, 2017) (same); *Stanley v. distribution Alternatives, Inc.*, 2017 WL 6209822, at *2 (C.D.

15   Cal. Dec. 7, 2017) (same).

16       58.    Because these are full-time employees who already regularly worked overtime, if

17   they had off-the-clock work, virtually all that additional time could be unpaid overtime. *See* Black

18   Decl., ¶ 13. Nevertheless, USA Debusk will use a conservative violation rate of only 20% for

19   overtime. Thus, using the already conservative estimate of $594,400.71 in straight time wages

20   owed for off the clock work (see prior section on unpaid wages), and assuming only 60% of that

21   was related to overtime and an addition 1/2 (0.5) rate of pay is owed (overtime is paid at 1.5 the

22   regular rate and the prior unpaid wage calculation already accounts for the 1.0 rate), then an

23   additional $178,320.21 is reasonably in controversy for the first component of this claim  for the

24   first component ($594,400.71 * .60 violation rate * 0.5 pay owed).

25       59.    As for the second component, Plaintiff alleges that all overtime was paid at the

26   wrong rate by maintaining a "policy" of failing to take into account "ticket bonus pay" and "bonus

27   pay." *See* Scheithauer Decl., Exh. B., Complaint, ¶ 66. Plaintiff alleges that such bonus pay should

28   have increased the hourly rate used by USA Debusk for calculating overtime. *Id.*

CALL &
JENSEN
EST. 1998

60.     The Class members worked approximately 343,190 hours of overtime. *See* Black Decl., ¶ 8. Conservatively assuming that the overtime rate paid to the Class was understated by $5.00 per hour only 60% of the time, the amount in controversy would be as follows: 343,190 hours * $5.00 * 0.60 = $1,029,570.00 in overtime for the second component.

61.     Combining the calculations for the two components of overtime (off-the-clock and wrong rate) alleged by Plaintiff show a combined amount in controversy of **$1,207,890.20** ($178,320.21+ $1,029,570.00).

### 4.     Plaintiff's Claim for Meal Period Premium Pay

62.     Plaintiff makes a number of allegations regarding meal periods and the failure to provide them and/or not provide the premium pay for non-compliant meal periods. Plaintiff alleges as to meal periods: (a) that employees did not get compliant meal periods because they were cheated out of full meal periods by "rounding" of time; (b) that even where employees received meal periods, then did not get "uninterrupted" duty-free meal periods (i.e., had to do some work or were not relieved of all duties) during the meal period, thus triggering a violation. Complaint, ¶ 72.

63.     Plaintiff further alleges that where there were meal violations, Defendants did not pay "one (1) hour of additional pay at their regular rate of pay for each workday that they did not receive all legally required and legally compliant meal periods." *Id.*, ¶ 73.

64.     Finally, Plaintiff alleges that even where meal premiums were paid for missed, interrupted, or otherwise non-compliant meal periods, USA Debusk did not pay the meal period premium pay at the correct "regular rate" because bonuses were not factored into the regular rate. *Id.*, ¶ 74.

65.     Where a complaint provides minimal evidence of the frequency of alleged violations (but alleges violations were part of a "pattern and practice" or "matter of policy"), California district courts have found estimated violation rates of 20-60% reasonable and conservative for purposes of calculating the amount in controversy. *See*, *e.g.*, *Rubalcaba v. R&L Carriers Shared Services, LLC*, 2024 WL 1772863, *2-3 (N.D. Cal. April 23, 2024) (noting courts in the Ninth Circuit approve estimating violation rate of up to 60% where complaint alleges a "pattern and practice" without specific limiting details); *Bryant v. NCR Corp.*, 284 F. Supp. 3d

1147, 1151 (S.D. Cal. 2018) (finding defendant's estimate of a 60% violation rate "reasonable" and "conservative[]"); *Feao v. UFP Riverside, LLC*, 2017 WL 2836207, at *4 (C.D. Cal. June 29, 2017) (same); *Alvarez v. Office Depot, Inc.*, 2017 WL 5952181, at *3 (C.D. Cal. Nov. 30, 2017) (same); *Stanley v. distribution Alternatives, Inc.*, 2017 WL 6209822, at *2 (C.D. Cal. Dec. 7, 2017) (same).

66.     Based on the estimated 27,509 workweeks of the Class and assuming an employee only worked 5 days per week (which was standard, although some employees worked more than 5 days per week at times) [*See* Black Decl., ¶¶ 8-15], and only counting 1 meal period per day (not accounting for days where an employee worked more than ten hours and was entitled to a second meal period) and then applying a conservative 60% violation rate, that would equate to 85,527 meal premiums owed (27,509 workweeks x 5 days per week x 1 violation per workday * .60). Using the average hourly rate of $28.81 during the class period and providing one hour of premium pay for the meal period violations, that would equate to at least **$2,377,602.80** in meal period premiums in controversy in this case (85,527 meal period premiums x $28.81).

### 5.     Plaintiff's Claim for Rest Period Premium Pay

67.     Plaintiff alleges that USA Debusk failed to provide legally compliant rest periods. *See* Scheithauer Decl., Exh. B., Complaint, ¶ 81.

68.     Pursuant to California Labor Code § 226.7, an employee is entitled to a wage premium payment of one hour of additional pay for each workday a legally complaint rest period is not provided (in addition to the minimum wages that must be paid for the time actually worked).

69.     Plaintiff's Complaint is obtuse as to why rest breaks were allegedly not provided, but does say that USA Debusk had a "policy, practice and/or procedure" that resulted in the failure to permit legally required rest breaks and the failure to pay premium payments on those non-compliant rest breaks. Complaint, ¶ 81.  Assuming it is true that USA Debusk had some "policy" against providing all compliant rest breaks where employees were free from employer control for the full legally mandated rest break, then the class members could be entitled to a wage premium payment of one hour of additional pay for each workday that the policy was in effect during the class period.

70.    Where a complaint provides minimal evidence of the frequency of alleged violations (but alleges violations were part of a "pattern and practice" or "matter of policy"), California district courts have found estimated violation rates of 20-60% reasonable and conservative for purposes of calculating the amount in controversy. *See, e.g., Rubalcaba v. R&L Carriers Shared Services, LLC,* 2024 WL 1772863, *2-3 (N.D. Cal. April 23, 2024) (noting courts in the Ninth Circuit approve estimating violation rate of up to 60% where complaint alleges a "pattern and practice" without specific limiting details); *Bryant v. NCR Corp*., 284 F. Supp. 3d 1147, 1151 (S.D. Cal. 2018) (finding defendant's estimate of a 60% violation rate "reasonable" and "conservative[]"); *Feao v. UFP Riverside*, LLC, 2017 WL 2836207, at *4 (C.D. Cal. June 29, 2017) (same); *Alvarez v. Office Depot, Inc.*, 2017 WL 5952181, at *3 (C.D. Cal. Nov. 30, 2017) (same); *Stanley v. distribution Alternatives, Inc*., 2017 WL 6209822, at *2 (C.D. Cal. Dec. 7, 2017) (same).

71.    Based on the estimated 27,509 workweeks of the Class and assuming these full-time employee only worked 8 hours a day for 5 days per week (although employees regularly more) [*See* Black Decl., ¶¶ 8-14], and counting 2 rest breaks per day that full-time employees would be entitled to receive under Plaintiff's allegations, that would mean that there are 275,090 rest breaks in controversy (27,509 workweeks* 5 days * 2 breaks per day). Assuming a violation rate of only 60% (i.e. the "policy" precluding proper rest breaks only precluded a proper rest break 60% of the time), that would equate to 165,054 rest break premiums owed. Thus, multiplying that by the average hourly rate of pay would equate to at least **$4,755,205.7** in rest period premiums in controversy (165,054 rest break premiums * $28.81).

### 6.    Plaintiff's Claim For Underpayment of Sick Pay

72.    Plaintiff alleges that USA Debusk violated Cal. Labor Code § 246 by having a sick leave policy that was not compliant with California law for two reasons: (1) USA Debusk's policy did not permit employees to accrue paid sick leave at the rate of no-less than 1 hour of pay per every 30 hours worked; and (2) even when sick pay was allowed and paid, USA Debusk paid it an the allegedly wrong rate (did not use the proper regular rate that took into account bonus pay). Complaint, ¶ 41-43.

CALL & JENSEN EST. 1998

73.    Plaintiff's first allegations that USA Debusk did not allow employees to accrue vacation at the proper rate per hour worked, is impossible to understand. There are no details provided. USA Debusk paid the Class 15,715 hours of sick pay during the relevant time. *See* Black Decl., ¶ 8. Assuming a conservative estimate of 20% violation rate (i.e., that the accrual policy should have allowed an additional, 20% more of sick pay), that would mean an additional 3,143 in sick hours should have accrued. At that standard average hourly rate of $28.81, that would put in controversy $90,549.83 (3,143 hours at $28.81). *See* Black Decl., ¶ 8.

74.    Plaintiff's second allegation that USA Debusk paid the sick leave at the wrong rate is similar to the wrong rate allegations for the overtime claim. USA Debusk members were paid 15,715 hours of sick pay.  *See* Black Decl., ¶ 8. Assuming that the sick pay underpay rate involves the same conservative underpay rate of $5.00 per hour that was used in the overtime calculation also for the alleged incentive wages not added to the calculation, that would put $78,575 in controversy (15,715 * $5) on the sick leave pay claim based on a wrong rate.

75.    Combining the two sick pay theories alleged means an estimated total in controversy on the sick pay claim of **$169,124.83** ($90,549.83 + $78,575).

### 7.    Plaintiff's Claim for Lack of Accurate Itemized Wage Statements

76.    California Labor Code § 226(a) provides that employers must, at the time of payment of wages, issue itemized wage statements which reflect nine (9) enumerated categories of information, including gross wages earned, total hours worked, deductions, net wages earned, inclusive dates of the pay period, name of the employee and name and address of the legal entity that is the employer.

77.    Plaintiff's Complaint alleges that this claim is a "derivative claim" to all the other violations alleged in the Complaint. *See* Complaint, ¶ 150 ("derivative of Plaintiff's claims above"). Basically, if any of the other claims above are true (i.e. off-the-clock work, non-complaint meal/rest period, pay of overtime or sick leave at the wrong rate, etc.), then by definition the wage statements were wrong because they did not contain all the proper information that should have been on them (the correct number of hours worked, the correct pay owed, etc.).

CALL&
JENSEN
EST. 1998

78.    For example, failing to report on the wage statements the meal and rest period premiums that Plaintiff and the Class allegedly earned for missed meal and rest breaks (see previously), could potentially constitute a violation of Labor Code § 226. *Naranjo v. Spectrum Security Services, Inc*., 13 Cal.5th 93, 121 (2022); *see also Id*. at 125-126.

79.    Section 226(e) provides for a statutory penalty for violations of Labor Code § 226(a)'s wage statement requirements of $50 or actual damages per employee for the initial pay period in which a violation occurs and $100 per employee for each violation in a subsequent pay period, not exceeding an aggregate amount of $4,000. Cal. Lab. Code § 226(a). *See* Complaint, ¶ 154.

80.    Plaintiff alleges that as a result of these problems with every wage statement, that members of the Wage Statement Class (i.e., the One-Year Period from before the Complaint was filed) are entitled to recovery under Labor Code 226(e) – i.e., the maximum of $4,000 per employee. *See* Scheithauer Decl., Exh. B., Complaint, ¶ 154.

81.    USA Debusk pays its employees once per week – thus they receive a wage statement (paystub) each week. *See* Black Decl., ¶ 12. There were 277 employees in the Wage Statement Class (the One-Year Period prior to when the Complaint was filed) and 8,144 workweeks for that group (thus the same amount of 8,144 wage statements). *Id*., ¶ 8, 12. After deducting $50 for each of the 277 employee's initial wage statement and paying $100 for the remainder, that would put in excess of $800,000 dollars at issue. However, the maximum penalty of $4,000 would be reached for any employee that received at least 41 paystub violations. Considering the average length of employment is well excess of one year for USA Debusk (Black Decl., ¶ 18), the maximum penalty would be reached by most employees. Even if a conservative maximum penalty rate of only 60% were applied only to the Wage Statement Class, the amount put in controversy would be around **$664,800** (277 employees * $4,000 * .60). *See* Black Decl., ¶¶ 9, 18.

1

      **8.    Additional Waiting Time Wages Reasonably Owed Under Plaintiff's**

2

      **17200 et seq. Claim With Request for All Wage and Other Monies**

3

      **Rightfully Owed**

4

    82.    In addition to the various specific claims, Plaintiff alleges a "catch-all" claim as the

5

Seventh Cause of Action for unfair competition under Cal. Bus. & Prof. Code § 17200 et. seq. Per

6

that catch-all cause of action, Plaintiff claims that he and others are "entitled to restitution of all

7

wages and other monies rightfully belonging to them that" USA Debusk "failed to pay and

8

wrongfully retained…"  Complaint, ¶ 160. That could be interpreted to include waiting time wages

9

for failing to pay all wages due a separating employee.

10

    83.    Pursuant to California Labor Code §203, an employer that fails to pay a departing

11

employee all of their earned wages at the time of termination may be liable to pay the departed

12

employee additional wages equal to their daily wages up to a maximum of thirty days. *See* Cal.

13

Labor Code § 203.

14

    84.    Plaintiff alleges that the Class was not paid all wages during the course of

15

employment (such as not receiving wages for all hours worked, unpaid overtime, not receiving

16

meal and rest break premiums, etc.) and thus Plaintiff and members of the Class whose

17

employment has separated may be entitled to additional payment pursuant to Labor Code § 203.

18

    85.    If Plaintiff's allegations are correct and employees *had even one violation* of a

19

meal/rest period/unpaid overtime/off the clock work, etc. *at any point* during their employment

20

during the class period, then the separated employees could reasonably be entitled to an additional

21

30 days of pay per Labor Code § 203. Based on the allegations in the Complaint, it is not

22

unreasonable to assume that every terminated employee had at least one violation over the course

23

of the four-year + class period prompting an unpaid wage claim. Said another way, even if we use

24

a hyper-low .001% violation rate for all the claims for unpaid wages as to each employee (i.e., that

25

an employee was not paid for all time worked only .001% of the time), that would trigger at least

26

one violation during employment that would itself then trigger the Labor Code § 203 wages of

27

thirty days' of pay.

28

86.     There are 297 former employees for the Class, at the average daily rate of $230.48 ($28.81 average hourly rate * 8 hour day). *See* Black Decl., ¶¶ 8, 12. Thus, the Labor Code § 203 claim puts in controversy approximately **$2,053,576.80** ($230.48 daily rate * 30 days * 297 former employees).

### 9.    Attorneys' Fees

87.     There are a number of potential statutes permitting a prevailing plaintiff to recover attorneys' fees if that party prevails on the claims, including, *inter alia*, Labor Code §§ 218.5, 226(e) and 1194, and Code of Civil Procedure § 1021.5.

88.     "Where an underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy." *Lowdermilk v. U.S. Bank National Ass'n*, 479 F.3d 994, 1000 (9th Cir. 2007) (citing *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1155-56 (9th Cir. 1998)).  The Ninth Circuit has "long held . . . that attorneys' fees awarded under fee-shifting statutes or contracts are included in the amount in controversy." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 927 (9th Cir. 2019*); see also Fritsch v. Swift Transp. Co. of Ariz.*, *LLC*, 899 F.3d 785, 794 (9th Cir. 2018). Accordingly, future attorney's fees are properly included in calculating the amount in controversy for CAFA removal. *Id*.

89.     Attorneys' fees may be awarded based on the lodestar method (calculated by applying reasonable hourly rates to the time reasonably spent, as adjusted by a risk multiplier where appropriate). *Staton v. Boeing Co.*, 327 F.3d 938, 967-68 (9th Cir. 2003). Alternatively, the court may award fees as a percentage of the fund recovered. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998). The Ninth Circuit has established 25 percent as the "benchmark" attorneys' fees award in common fund cases, although fees may be adjusted or replaced by a lodestar calculation "when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

90.    Given the allegations in the Complaint, 25% attorneys' fees on top of the alleged damages, wages and penalties put in controversy and analyzed in this Notice of Removal ($10,363,424.95 * .25) – would total **$2,590,856.24** in attorneys' fees.

**10.    The Aggregate Amount in Controversy Exceeds $5,000,000**

91.    As shown above, if all the allegations in the Complaint are assumed as true, the aggregate amount in controversy, as pleaded by Plaintiff, is at least **$12,954,281.20:**

| | |
|---|---|
| Unpaid Wages | **$594,400.71** |
| Liquidated Damages | **$594,400.71** |
| Overtime Wages | **$1,207,890.20** |
| Meal Break Premium | **$2,377,602.80** |
| Rest Break Premium | **$4,755,205.70** |
| Sick Pay | **$169,124.83** |
| Failure to Provide Accurate Wage Statements | **$664,800.00** |
| Waiting Time Payments | **$2,053.576.80** |
| Sub-total | **$10,363,424.95** |
| Attorneys' Fees @ 25% | **$2,590,856.24** |
| **Total in Controversy** | **$12,954,281.20** |

92.    In sum, because minimal diversity of citizenship exists, Plaintiff seeks to certify a class of exceeding 100 class members, and the amount in controversy exceeds $5,000,000, this Court has original jurisdiction of the action pursuant to 28 U.S.C. § 1332(d) and removal to this Court is proper on this alternative basis.

**V.    VENUE**

93.    Venue lies in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1441(a) and 1446(a). Plaintiff originally brought this action in the Superior Court of the State of California, County of Contra Costa and events alleged in Plaintiff's Complaint are alleged to have occurred within this judicial district. *See* Scheithauer Decl., Exh. B., Complaint, ¶ 2. The appropriate assignment of this action is to the Northern District of California.



1    **VI.    NOTICE OF REMOVAL**

2       94.    This Notice of Removal will be promptly served on Plaintiff and his counsel, as

3    well as filed with the Clerk of the Superior Court of the State of California for the County of

4    Contra Costa.

5       95.    WHEREFORE, defendant USA Debusk requests that this civil action be removed

6    from the Superior Court of the State of California, County of Contra Costa, to the United States

7    District Court for the Northern District of California.

8    Dated: March 10, 2025                CALL & JENSEN
                                          A Professional Corporation
9                                         John T. Egley
                                          Chris C. Scheithauer
10                                        Alexander M. Harrison

11

                                          By: /s/ Chris C. Scheithauer
12                                            Chris C. Scheithauer

13                                        Attorneys for Defendant USA DEBUSK LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28